Gaston, Judge.
 

 An action of ejectment was heretofore instituted by the defendants, the heirs of Darling Belk, deceased, to recover from the plaintiff a tract of land, which had been reserved unto the Indian Chief, Yonah, or the
 
 *164
 
 .Great Bear, in the treaty with the Cherokees of the 27th of February, 1819, and which was alleged to have been conveyed by the said Yonah, first to the said Belk, and after-wards to the plaintiff. In this action there was a judgment rendered in the Superior Court against Love, (the plaintiff in this bill,) who appealed therefrom to this court, and here, at December Term, 1834, the judgment of the Superior Court was affirmed. The possession having been surrendered in pursuance of this judgment, and an action of trespass for the mesne profits
 
 having been brought, Love, on the
 
 13th of October, 1835, filed this bill against the heirs, and against Sally Belk, the widow of the said Darling Belk, ip which he prays that the plaintiffs in the said action for the mesne profits may be perpetually enjoined from the prosecution thereof; that the conveyance from Yonah, under which the heirs of Darling Belk set up title to the land, may be cancelled and annulled; that the defendants may be declared trustees in regard to the said land for the Plaintiff, and may be decreed to convey to him pll the right and title which they claim, or can claim, under the said conveyance of Yonah; and that they be decreed to refund to the plaintiff the costs incurred by him in the prosecution of the suit at law. The bill charges that the plaintiff purchased of the said Yonah part of said tract, on or about the 25th of November, 1822, and the residue thereof, on or about the 8th of September, 1824; at which
 
 times
 
 respectively, the said Yonah duly executed conveyances therefor, which have been proved and registered according to law. The plaintiff admits, that antecedently to either of his purchases, and, as he believes, on or about the first of November, 1819, the said Yonah sold to Darling Belk the whole of his reservation, and executed a conveyance therefor; but the plaintiff charges that afterwards it was fully agreed between the said Belk and Yonah, that the sale aforesaid should be rescinded, and the parties restored to their respective rights; that Yo-nah should refund whatever had been received, on account of the said Belk’s purchase, and that Belk should surrender to Yonah the deed so by him executed, and which had not been registered, nor proved for registration; and avers that,
 
 *165
 
 in pursuance of said agreement, Yonah did refund all of the purchase money; but Belk fraudulently imposed upon Yo-nah, by delivering to Yonah another paper, as and for the deed which he had engaged to surrender; and that the said Belk died in the month of November, 1820, without having surrendered the deed.
 

 The plaintiff charges that after the death of Darling Belk, the deed aforesaid was, in the presence of Alfred Brown, the administrator of said Belk, and whose name was subscribed as the attesting witness to the execution of said deed, brought by Sally Belk, the widow of the said Darling, and by her exhibited to Robert Love, the Clerk of the County Court; and that she then stated that the contract pf salg between her husband and the Big Bear had been rescinded; but that her husband, without the Big Bear’s knowledge, had kept the deed; and she then proposed to the said Robert to give him one half of the land, if he would assist her in getting it under the deed. The plaintiff also charges that the said Sally made similar statements and proposals to other persons; and after-wards, with a full knowledge that the contract of sale between Yonah and her husband had been rescinded, and that the said deed ought to have been surrendered, and that her said husband had cheated Yonah by a pretended surrender of it, caused the said deed to be proved and registered as a valid and subsisting deed. The plaintiff alleges positively that Darling Belk, as late as the 8th of November, 1820, which was but a Very few days before his death, declared to
 
 him,
 
 and acknowledged to others, that the sale to the said Belk had been rescinded; and charges that, in consequence of the knowledge thus communicated, as well as otherwise acquired, he purchased from the said Yonah, with .full assurance that the said Yonah was the undoubted proprietor of the land. The heirs of Belk, being then infants, answered by their guardian, Joseph Welch. In this answer they aver that the allegations contained in the bill relative to the alleg-. ed fraud of their father, in not surrendering the deed, which he had obtained from Yonah, but surrendering another paper as and for said deed, which it is falsely alleged he engaged to surrender, were urged by the plaintiff, on the trial of the ac
 
 *166
 
 tion of ejectment, and after a laborious and patient investigation, were found to be untrue. They declare that, in the summer of the year 1819, their.father contracted with Yonah for the purchase 0f his reservation, and agreed to give him therefor two hundred dollars, and to maintain him during his life upon the land, that the two hundred dollars were paid to Yonah in two horses; that Yonah executed a bond to make title for the land, and their father procured a deed to be drawn therefor by the late Felix Walker; that before this deed was executed,
 
 their
 
 father, having heard that Yonah could not, by law, convey his interest in the reservation, and having communicated this information to Yonah, he and the said Yonah did, in the month of September, 1819, rescind the sale; their father surrendered the bond for title which had been given as aforesaid; and Yonah returned the horses received in payment; that afterwards their father had a conversation with Felix Walker, who informed him. that the treaty gave Yonah a complete title to the land included within his reservation, and that Yonah had the right in law to conyey it; that in consequence of this information, on the 1st of November, 1820, their father made a purchase a second time from Yonah, upon
 
 the
 
 same terms as before. — paid the two hundred'dollars, partly in money and partly in store goods; and Yonah thereupon executed the deed, which had been prepared by Walker, and which had been in Belk’s possession up to that time. They represent that the deed purports to have been executed on the 1st of November, 1819, but it was actually executed 1st of November, 1820; and that the cause of this error is because Mr. Walker, when he prepared the instrument, inserted the date of the year in which it was expected that the deed would be executed, but left blanks for the insertion of the day and the month; and that, at the time of the actual execution, these blanks were filled, but the date of the year, 1819, was left unaltered; and they allege that the deed was actually executed on the 1st- of November,. 1820, at the house of their father, in the presence of their mother, Sally Belk, of Alfred Brown, who attested the same; and of Nicey Brown, the wife of the said Alfred. They deny explicitly the charge that their father delivered to Yo-
 
 *167
 
 nah, as and for this deed, any other paper; but say that, after the rescission of the first contract, he returned to Yonah the bond to make title, as it was his duty to do; and declare that the second contract, as evidenced by the deed made 1st November, 1820, never was rescinded nor intended to be rescinded between the parties; but that, on the contrary, a very few days after its execution, and when their father, under his said purchase, was about to take possession of the said land, and had actually procured assistance to erect a house thereon, he was kicked by a horse, and died next day of the injury thereby inflicted. They farther state that, after the death of their father, Alfred Brown, who administered on his estate, carried the said deed to Robert Love, the father of the plaintiff, and Clerk of the County Court, for the purpose of having the same proved; that the said Robert informed Brown that the deed was invalid, for that Yonah could not sell his reservation, but nevertheless proposed that he, Love, would take the deed to Buncombe Superior Court, and consult the lawyers there respecting it; that the deed was therefore left in the hands of Robert Love; that said Love afterwards informed Brown that he had been advised by Mr. Wilson, a lawyer of reputation, that the deed was of no account; and advised Brown to recant the bargain with Yonah, and endeavor to get back the property paid by his intestate for the land; that Brown and Yonah, the deed being still in Robert Love’s possession, did make a verbal agreement to annul or rescind the sale; and Brown procured from Yonah thirty-five or forty bushels of corn in part for the price so received by Yo-nah, but was never able to get any thing more; that some time afterwards, Brown was informed that he had no authority to rescind the sale, and that he had acted improperly in undertaking so to do, and in consequence thereof applied to said Robert Love for the deed; that the restoration thereof was for a long time delayed and refused, under various pretences,, which the defendants allege to be false; but that finally, after an action of detinue had been brought therefor in behalf of these defendants, the same was given up to their guardian, who caused it to be registered.
 

 These defendants do not admit that the plaintiff paid Yo
 
 *168
 
 náh any consideration for the bond, and charge that, when al.contracted with and took his deeds from Yonah therefor, he had perfect knowledge of the existence of the
 
 deed to their
 
 father, and had seen it, while in possession'of his father. They deny absolutely the charge that their father, at any time after the 1st of November, 1820, ever told the plaintiff, or any other person, that the contract of sale was rescinded, although they admit that he may have so declared; antecedently to that day, and in reference to the first' contract, which had in truth been rescinded; and further deny that their mother and co-defendant, Sally Belk, ever made the declarations which in the bill are charged to have been made' to Robert Love in relation to the rescinding of the contract and retention of the deed by her husband.
 

 They also insist that the plaintiff procured the deeds under which he sets up claim to the land in dispute to be executed by Yonah of the Big Bear, by fraud; for that he caused the said Yonah to be made drunk, and, while in that situation, obtained from him’ the said deeds, without any adequate consideration; the plaintiff at the same time perfectly knowing that the said Yonah had fairly sold and conveyed the land to their father, and that the contract of sale, evidenced by said conveyance, had
 
 not been
 
 rescinded or released, They also insist that the judgment rendered in the suit at law is a bar to the relief sought by this bill, because every ground now insisted on as furnishing a claim for such relief was Urged by the plaintiff; and attempted to be proved on the trial of the issue in that suit, and was conclusively determined against the plaintiff. The defendant Sally Belk answers separately, and states that she is the widow and relict of Darling Belk, and Was personally privy to, and cognizant of, the transactions between Yonah and her husband, in relation to their dealings with respect to the land, which is the subject matter of this controversy. In express terms she sets forth the contract of sale made between them about the last of June, or 1st of July, 1819, the delivery of the horses by Belk in payment of the consideration; the execution by Yonah of a bond to make title;! the rescinding of that contract on or about the 1st of September, 1819,- in con
 
 *169
 
 sequence of erroneous information that Yonah could not convey; the receiving of mote correct information on that point, from Felix Walker, afterwards, who had prepared the deed of conveyance before the rescinding of the contract; the making of a new or second contract, on or about the 1st of November, 1820; the execution thereupon; by Yonah, of the deed of conveyance previously so prepared, which was done in her presence, and attested by Alfred Brown, all fully corresponding with the allegations as hereinbefore stated in the answer of her co-defendants. This defendant says that she knows that, between the 1st O'f September, 1819, when the first contract was rescinded, and the 1st of November; 1820, when the second was made and the conveyance executed, Yonah returned to her husband the two horses, and so'me other things, (whether all of not she is ignorant,) which he had received as a payment for the land; that, upon the day the second contract was made and consummated, no horses were received by Yonah, who declared that he did not want horses, for that he could not keep them out of his corn; that Yonah was paid partly in cash and partly in goods, that is to say, blankets, a big co'at, pantaloons, homespun, shawls, and various other articles; that her'husband, on Monday, and. as she believes, the 17th of the sa'me month, while preparing to start with Alfred Brown and sevén Indians, for the pur. pose of building a house for himself aM family, on the land so bought by, and con keyed to him; was accidentally kicked by a horse, and died of the wound on the next day; that she' is certain that, from the time of the execution of the conveyance by Yonah, until this fatal accident occurred, her husband and Alfred Brown were constantly at home, and busily engaged in pulling each other’s corn; that the plaintiff did noé come there during that time; and that her husband did noé have, and could not have had, with the plaintiff, the conversation which the bill charges to have taken place, on the 8th of November, 1820; that her husband’s residence was among the Indians; and that a door only separated the partition between her room and the store room, where he was doing business, when not actually engaged in pulling corn, as before stated; ang that she is satisfied that hex husband never did;
 
 *170
 
 and therefore denies that he ever did, inform the plaintiff, or any other person, after the said 1st of November, that the sale was rescinded. The defendant .further denies that she brought the deed of conveyance to Robert Love, or exhibited it to him, or made any communication to him of any sort respecting it¡ or made to him, or any person whatever, the proposals falsely charged in the bill; and denies that she ever had the said deed in her possession. The defendant further insists that the plaintiff imposed upon Yonah in getting deeds of conveyance from him, who was made drunk by the said plaintiff, and being ignorant of the English language, and the witnesses to these deeds not being able to explain the contents thereof to him,- was easily cheated therein. She also refers to and adopts the answer of her co-defendants, and insists on all the matters of defence therein set up aud relied upon.
 

 Upon the coming in of these answers, the injunction, which had issued when the bill was filed,- was, upon motion of the counsel for the defendants, dissolved; and thereupon the plaintiff prayed and had leave to hold over his bill as an original, and a general replication was put in to the answers. Commissions thereupon issued to both parties,- and their proofs having been completed, the cause was set down for hearing, and transmitted to this Court to be heard.
 

 The first deed exhibited by the plaintiff purports to convey all that part of Yonah’s reservation which lies on the north east side of the Tuckaseegee River, estimated to contain 400 acres, in consideration of the sum of three hundred dollars; thereby acknowledged to be paid, is dated 25th of November, 1822, attested by Daniel Bryson, Thomas Rogers and Thomas Watson, was proved in Court by Thomas Rogers, at the June Term, 1823, and registered on the 19th of February, 1824. The second deed purports, in consideration of the further sum of two hundred and fifty dollars, thereby acknowledged to be received, to convey to the plaintiff the residue of said reservation, is dated the 8th of September, 1824, is attested by W, Reid, Robert Shipp and James R. Love — . was proved at March Term, 1826, by the said Shipp and Love — and was registered on the 25th of April, 1826. The
 
 *171
 
 Instrument, which the pleadings on both sides represent as a deed of conveyance from Yonah to Darling Belk, and is exhibited as such by the defendants, appears on its face to have been executed on the first of November, 1819 — is tested by Alfred Brown — was proved by him at the April Term,
 
 1827
 
 — and was régistered on the 8th of May thereafter — and purports to convey to the said Belk all of Yonah’s reservation, for the sum of two hundred dollars.
 

 It is not questioned, nor can it be questioned, but that the case stated by the bill is one which entitles the plaintiff to the interposition of this court. If, after the
 
 execution
 
 oí the alleged conveyance from Yonah to Belk, but before the solemnities of probate and registration had been complied with, so as to give the deed full legal operation, the contract of sale was rescinded, the consideration repaid, or agreed to be repaid by the vendor, and a distinct engagement made by the vendee to surrender the deed for- cancellation, the vendor, whose legal title was not yet completely divested, remained the owner of the lands, and had full right to sell and convey the same to another. The withholding of the deed— the surrender of another paper as and for the deed — and the subsequent probate and registration so as to impart operation to the deed from the time of its execution, and thereby destroy the title at law of the purchaser from the vendor, after-the rescinding of the contract- — make out- a clear case of fraud, peculiarly fit for the jurisdiction of a Court of Equjty, and calling for all the redress which such a court can afford.
 

 The execution of the deeds by Yonah to the plaintiff, is not put in issue by- the pleadings. The answers fully admit
 
 that fact,
 
 but insist that an imposition or fraud was practised on Yonah by- the plaintiff, in procuring the deeds. The answer of Sally Belk does not state in what the fraud consisted, further than it alleges that the plaintiff made him drunk, and thereby was enabled to practice upon his ignorance with greater facility; but the answer of her co-defendants is more specific in charging that the plaintiff gave a very inadequate consideration for the land, the subject matter of the conveyances. We are of opinion that this objection, however well founded it may be in fact, is one which it is not competent
 
 *172
 
 for the defendants to take, and the truth of which it is therefore unnecessary for us to consider. The plaintiff claims, as the owner of a tract of land formerly belonging to Yonah, there should be removed, out of his way a legal impediment to the assertion of his title therein, and to his enjoyment thereof, interposed through the bad faith of Belk, and of the defendants claiming through Belk. It is necessary for him to shew that he has acquired Yonah’s estate in that land, and this he does shew by the exhibition of a conveyance, operative in law to pass that estate, and
 
 authenticated
 
 by the solemnities required by law to give it effect. If, indeed, such conveyance were obtained, as the defendants allege the deeds of the plaintiff were obtained, for an inadequate consideration, from an ignorant Indian, at a moment when his feeble judgment was rendered yet more feeble by intoxication purposely induced, certainly the court would withhold its aid from the perpetrator of the fraud, seeking assistance against his victim or those coming in under him; nay, would be ready to render to the person injured or his representatives, every relief in their power against the fraud, or the consequences of it. But Yonah is dead, and Yonah’s heirs, if he have any, are not before the court, and need not be before the court, because they have no interest in theyire
 
 sent
 
 controversy, and cannot be prejudiced or benefited by any decree made therein. If Yonah was not fairly treated in his dealings with the plaintiff, until those who may have succeeded to
 
 lus
 
 rights choose to complain thereof, and claim to have his conveyances to the plaintiff s.et aside, because of such imposition, they must
 
 stand,
 
 and, consequently, as against all other persons, must have the operation which properly belongs to them. It js frequently said indeed, that a Court of Equity will not be quickened into action by, nor extend relief to, volunteers or persons claiming as purchasers, for an inadequate price. But this doctrine, in its full extent, applies only to cases where the aid of such a court is invoked to create a trust or equity as resting in contract, or arising from an imperfect conveyance, and not where its protection is demanded for trusts or equities originally well constituted, and which have been assignd by a complete in
 
 *173
 
 strument effectual to transfer them.
 
 Patton vs. Clendenning,
 
 3 Mur. 68.
 
 Dawson vs. Dawson,
 
 1 Dev. Eq. 93.
 
 Ex parte Page,
 
 18 Ves. 140. The property which has passed under such a conveyance, must be protected. The owner of can demand protection from any court competent to afford it — and every court is bound to yield such protection, according to the nature of its jurisdiction, and the nature of .the wrongs menaced or committed. No one can be heard to say that the property passed, but under such circumstances as to place it and its owners in respect of it, out of the pale oí the law.
 

 We do not understand the answers as containing an allegation, that Yonah was
 
 incompetent,
 
 by reason of drunkenness, to execute the deeds to the plaintiff — or an
 
 allegation
 
 of any fraud in
 
 the act
 
 of execution. Certainly if'such allegations were intended to be insisted on, they ought to have been distinctly stated in the answers. We deem it, however, not amiss to add, for the satisfaction of the parties, that if such allegations be supposed to be contained in the answers, we are clearly of opinion they are not proved. Certainly the price was a very inadequate one, but there is no proof that Yonah was at all intoxicated at the time of making the deeds; and although it is not to be believed that, through the medium of the interpreters used, he could be made to understand the import of the particular words contained in the deeds, the proofs are satisfactory that he knew his bargain — that the deeds conformed to it — and that he deliberately executed them, in order to carry that bargain into effect.
 

 It is insisted in the answers, and the objection has been pressed at the hearing, that the facts alleged in the bill, as constituting the claim of the plaintiff to relief, were all urged by the plaintiff on the trial of the issue in the action of ejectment; and that by the judgment in that action, it is established that the facts so alleged did not exist. Certainly where a matter, proper for investigation in a Court of Law, has been there investigated, according to its established rules, or where a matter, strictly of legal jurisdiction, and which ought to have been urged as a defence in an action at law,
 
 *174
 
 has not been so brought forward — and there are no circuía* stances of fraud or unconscientious advantage, which require that the verdict or judgment should be put out of the way, a Court of Equity will not take it upon itself to re-examine what in such action has or ought to have been investigated. That court has not jurisdiction to review what was properly tried or triable at law. But the matter now sought to be investigated, could not have been investigated in the action at law, because it constituted no ground of defence in that action. The rescinding of the contract between Yonah and Belk, after the execution of Yonah’s conveyance; the engagement of Belk to surrender the deed of conveyance; the withholding of that deed; and the delivery of another paper, as and for the deed, did not, in law, annul the deed or reconvey the land. These facts, if they existed, constituted a gross fraud upon Yonah, and one very proper for the consideration of a Court of Equity.
 

 If Belk, or those claiming under Belk, afterwards, in further prosecution of this fraud, caused the deed to be registered, such registration nevertheless had relation in law to the execution of the deed, and thereby communicated to it legal operation from the time of its execution. If Yonah had not conveyed to Love, and the action of ejectment had been instituted against
 
 Mm,
 
 he could not have set up these matters as a defence in that action. The plaintiff, by Yonah’s conveyance, succeeded to Yonah’s estate and Yonah’s rights. His title was postponed in law to that derived by Belk under Yonah’s prior conveyance; and his claim to have that conveyance put out of the way, is not because that conveyance has been cancelled or annulled, but because in conscience it'
 
 ought
 
 to have been cancelled or annulled, and ought not to have been registered. The sole question, therefore, remaining to be determined is, whether the case stated in the bill be established by the proofs. That there was a contract of sale between Yonah and Darling Belk, sometime in the year 1819; that upon this contract property was transferred by the latter to the former, in payment or part payment of the land sold; that this contract was subsequently rescinded by the parties; and that the consideration so paid was returned by the ven
 
 *175
 
 dor, are facts about which there is no controversy.- The stantial issue between the parties is, whether the deed was executed to carry into effect
 
 this contract,
 
 or to carry in to effeet a second contract, made about the 1st of November, and which has not been rescinded. Upon this a vast mass of testimony has been taken on both sides; all of which we have deemed it our duty to consider attentively, although we do not think it necessary to state it in detail.
 

 The deed exhibited by the defendants bears date the 1st of November, 1819. If that be the date which it ought to bear, the issue is necessarily determined against the defendants. The language of the deed is also inconsistent with the state of things, at the time when defendants allege that the deed was executed. The subject matter, whichit purports to convey, is described as Yonah’s “ reservation of 640 acres,
 
 hereafter
 
 to be laid off and run and marked, according to the provisions of the treaty;” all of which was done, and the certificate of survey actually issued, at least as early as May, 1820. Strong, however, as is the internal evidence afforded by the deed, it certainly is not conclusive. An explanation of this discrepancy between the date of the deed and the day of its execution-, and between the language of. the instrument and the circumstances at that day, has been given in the answer by Sally Belk; and if this explanation
 
 be true,
 
 it satisfactorily accounts for these discrepancies. But, unless there be
 
 sufficient
 
 proof of its truth, the issue must be determined a. gainst the defendants. The answer of this defendant avers the matters therein stated as of her own knowledge, and being responsive to the allegations of the bill in this respect, it is to be regarded as strong and direct proof. This proof is strengthened by the equally positive testimony of her brother, Alfred Blown, and of his wife, Nicey Brown; which testimony corresponds with the answer fully and in every particular. Nor ought this minute correspondence between the answer of the defendant and the depositions of these witnesses to create any suspicion — or at least any strong suspicion — of the truth of the representation. It is not at all unlikely that the facts stated, if they did occur, should be known to all of them; it was natural, after the controversy had arisen, that
 
 *176
 
 they should frequently converse with each other respecting these facts; and therefore it is not extraordinary that their statements should be expressed nearly in the same language. gut, on the other hand, it must be conceded that such exact conformity is hot a circumstance to repel suspicion of a fabrication, if there be evidence
 
 aliunde
 
 to excite it. When there' is a conspiracy to pervert the truth, the conspirators are obliged to come to an explicit understanding with each other as to the extent of that perversion; and this concert almost necessarily moulds and fashions the very terms and phrases employed in carrying the conspiracy into effect. And we are obliged to say, in the present case, we see no medium between adopting as true the representation made by this defendant and these witnesses, or rejecting it
 
 in tolo
 
 as a base fabrication. There is no room for
 
 honest mistake
 
 in any of the matters they stf positively set forth; and
 
 falsus in uno falsus in omnibus.
 

 Five witnesses at feast directly contradict the defendant Sally Belk. Holloman Battle testifies that, after the death of her husband, she shewed him the deed, and wanted him to undertake to get the land by it, and proposed to share the gains of the transaction — that he then read the deed, and observed to her that it was written by Felix Walker, which at first she denied, but afterwards admitted- — that he commented on the language of it, (land “ hereafter to be run out,”) and expressed his opinion that she had better burn the deed, for that undertaking to set it up would only run her to expense — . that some days afterwards he asked her how
 
 she
 
 came by the deed, when she
 
 informed him that
 
 her husband and the Bear had made a bargain for the land, but had afterwards “rued;” that the property given for the land had been returned, and her husband was to have given up the papers, but that he had kept back the deed, expecting some day or other to hold the land by it — and that the witness declared that he would not be concerned in attempting to set up the deed, and advised her not to attempt it. Jacob Shuler deposes that, after her husband’s death, she shewed him the deed; offered to sell it to him for $50; admitted that she knew the contract had been rescinded; but said tfiat, if any money could be made by the
 
 *177
 
 deed, she was determined to make it. Colonel Robert Love declares that, soon after her husband’s death, she brought the deed to him, and proposed to give him half the land, if he would get it for he'r under the deed; and on being told by him of the general rumour that the sale of the land had been rescinded, she admitted that the fact was so. David McCay testifies, that after the trial of the ejectment suit, she complained that Welch, (the guardian of the children,) after gaining the land, was about to keep it for
 
 himself; and on that occasion
 
 declared that her husband, on his death-bed, had directed the papers to be given back to the Bear, for that they had
 
 “
 
 rued their bargain;” and said that she believed that he died under the impression that this had been done. Samuel Sanders gives us an affidavit made by her before him, as a magistrate, shortly after this conversa* tion, in which she fully repeats this declaration. Not one of these witnesses is attempted to be impeached in any manner) except that Sanders’s character for veracity is assailed by a single witness, Gideon Morris. It is impossible, under these circumstances, to place
 
 dny
 
 reliance upon her or her answer.
 

 Alfred Brown’s character for truth is strongly impeached* and, according to the majority of the witnesses examined on the subject, he is unworthy of credit. Besides minor considerations, his testimony is
 
 materially
 
 and directly opposed by that of Mark Coleman. This witness testifies that he came to the house where Belle died a few moments after his death..' From the other testimony we collect that this event occurred at his father’s house, in the neighbourhood of his own residence, on or about the 22nd day of November, 1820, in consequence of an injury received from a horse on the prece* ding day. The witness assisted in laying out the corpse* and afterwards went with Brown to Belk’s store, to get plank for a coffin. They then conversed on the subject of the state of the affairs of the deceased, and particularly respecting his contract with the Big Bear for his land; and Brown then told him that the contract was rescinded. He was present afterwards, on the day when Brown and the widow started for Court to administer on the estate, when Brown:
 
 *178
 
 shewed him the deed and the bond — stated that the reason f°r rescinding the sale was, because of the general opinion that the Bear could not make a lawful right; and said further, £,e should carry the papers to Court and taire advice upon them.
 

 There is then a crowd of witnesses, of whom
 
 ten
 
 at least must be taken to be unimpeachable — for no attempt has been made to discredit them. — who- testify positively to Belk’s uniform public declarations, some down to
 
 two
 
 days, and the rest to a
 
 week or ten days
 
 before his
 
 death, that he
 
 had rescinded the bargain with the old Bear; that he had not given back the deed, but had deceived the old fool, by giving another paper instead of it; that the old Indian would die before long, and then he would see whether he could not hold the land under the deed. And in addition to all this, we have the testimony of Belk’s mother and sister, Ferribee Belk and Rebecca Woodfin, which, if believed, is conclusive. They both state, in substance, that the deed was written in their presence, before the land was run out, and in watermelon .time, by Felix Walker; and that in the course of a few months thereafter, they heard, from Belk, of its execution. This establishes the date of it, 1st November, 1819, tobe correct. They were both present when Belk died at his father’s house; and they say that, after he had received the fatal blow, which was to hurry him off to the grave before “ the poor old Indian,” and after he felt that death was at hand, he gave express directions for surrendering the deed to the Bear, and declared that he had no claims to the land. Attempts have been made to discredit these two witnesses. A majority of those, however, who have been examined as to their credit, express a decided opinion that, from her general character, the old woman is worthy of belief; and it is in evidence, from the sheriff of the county, that when Welch, the guardian of her grandchildren, was about to summon her as a witness in the suit at law, she then declared substantially to him what she now testifies, and on that account was not summoned.
 

 The witnesses are about equally divided, as to the credit due to Rebecca Woodfin. We would not therefore place great
 
 *179
 
 reliance on her testimony — but supported as it is by the evidence of her mother, and by Sally Belk’s declaration and affidavit to the same effect, we cannot reject it as unworthy of belief. Upon the whole we must say, upon the proofs, the contract of sale between Yonah and Belk was rescinded after the execution of the deed conveying the land; and that this deed was fraudulently retained, instead of being surrendered, as Belk had engaged should be done. It is quite probable, we think — and there is much in Rebecca Wood-fin’s deposition, and in those of other witnesses,
 
 tending
 
 to establish the fact — that there were subsequent negotiations between the parties with a view to another contract; but there is nothing to shew that another contract was finally made — much less that the old deed was re-delivered, or was regarded as re-delivered, or that any other deed was after-wards executed. And we hold that the plaintiff, as the assignee of Yonah, has a right to require that the deed, thus fraudulently kept back, and which, by reason of its registration, fraudulently obtained, overreaches and defeats Yonah’s conveyance to him, should be put out of the way of that conveyance and of his rights thence derived.
 

 The decree will be that the defendants be declared trustees of the legal title, which they have or may have in the land, in question, for the plaintiff, and do forthwith deliver the possession thereof to him; that an account shall be taken of the rents and profits thereof, and by whom the same were or might have been received since the possession was yielded by the plaintiff, and also of the costs which have been recovered and received from the plaintiff by the defendants, or any of them, upon the suits at law; that such of the defendants as are of age do, by proper conveyance to be settled by the Clerk of this Court, release all their estate and interest in the land to the plaintiff; and the defendants not of full age shall, after attaining the same, and within six months after being served with a copy of this decree, convey and release in like manner; and that the cause be retained for further directions upon the coming in of the report.
 

 Per Curiam. Decree accordingly.